UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL M. NGOBENI ) | |
|     Plaintiff ) | CIVIL ACTION NO. |
| vs. ) | 3:02 CV 1124 (MRK) |
| SHARON A. HARPER ) | |
|     Defendant ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

### I. Preliminary Statement.

1. Plaintiff, Paul M. Ngobeni, an attorney licensed to practice in Connecticut, New York and Massachusetts, brings this action for recovery of compensation for legal services rendered to defendant Sharon Harper, for vexatious suit and for slander/defamation against Sharon A. Harper, a citizen of the State of Kentucky.

### II. JURISDICTION:

2. Jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. §1332(a)(1), Plaintiff being a citizen of Connecticut, and Harper being a citizen of Kentucky, and the claimed damages exceeding $75,000. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. Section 1367.

### III. PARTIES:

3. The Plaintiff, Paul M. Ngobeni, is an attorney admitted to practice law in Connecticut, Massachusetts and New York. Plaintiff maintains his law practice at 914 Main Street, Suite 206, East Hartford, CT.

4. Defendant, Sharon A. Harper, a black female, is a resident of Louisville, Kentucky. Her address is P.O. Box 1314, Louisville, KY 40201-1314.

## IV. STATEMENT OF FACTS:

5. The plaintiff Paul M. Ngobeni, ("Plaintiff") was retained by Sharon A. Harper on or about July 1995 to represent Harper in connection with an employment discrimination claim arising from her termination by the Metropolitan District Commission ("MDC") in March 1997.

6. Harper was suing the MDC because her former employer (MDC) had discriminated against her on the basis of her race, color, and sex and has discharged her from her employment without just cause and in retaliation for her opposition to MDC's employment practices, unlawful under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. Sect. 2000e et seq. In addition, Harper sued the MDC alleging that the agency tried to ruin her reputation by spreading false rumors that Harper was promiscuous and engaged in perverse sexual acts in the MDC office or premises.

7. At the time Harper sought plaintiff's services, Harper had been involved in ongoing involved in litigation, grievance and arbitration proceedings against the MDC and other entities and had been represented by at least four other law firms.

8. Harper's cases involved events dating back to 1987 and required Plaintiff to read literally thousands of pages of testimony from administrative proceedings which lasted over nine years and involved hundreds of exhibits and many witnesses.

9. Plaintiff and Harper agreed that plaintiff would be paid $2000 as an up-front retainer. In addition, the parties agreed that Plaintiff's compensation for representing Harper in connection with her discrimination and related claims would be contingent upon the recovery of amounts in resolution of the employment discrimination and related claims.

10. The amount of Plaintiff's contingency fee was as follows: Harper would pay the **higher** of the following amounts: (a) thirty-three and one-third percent (33 1/3 %) of the gross amount paid or received as a result of any settlement, verdict or decision of any government agency, **or** (b) attorney's fees awarded by the court if she prevailed.

11. In addition to Plaintiff's compensation, Harper agreed to reimburse Plaintiff for costs and disbursements made by plaintiff in connection with the prosecution of the employment discrimination and related claims.

12. From July 1995 until on or about December 1999, Plaintiff diligently and expertly represented Harper in connection with her claims arising out of the termination of her employment by the MDC. The principal, but not exclusive, actions taken by Plaintiff and his associates included:

    a. Aggressively pursuing Harper's administrative CCHRO complaint, attending hearings before the CCHRO, drafting demand letters and preparing for a public hearing before the CCHRO. Prior to plaintiff's involvement, Harper's claim had been languishing before the CCHRO for over **eight (8)** years without resolution.

    b. Extensively researching the law, preparing pleadings, holding numerous meetings and telephone conferences with Harper and CCHRO staff counsel to determine the best way to maximize recovery for Harper in her claim against the MDC, discussing the pros and cons of a public hearing before the CCHRO as opposed to litigation in federal court and finally requesting a Right To Sue Letter from the Justice Department in order to pursue Harper's claims in court.

c.  Filing Harper's initial federal court Complaint, diligently conducting formal and informal discovery and immediately amending the said Complaint based on new Supreme Court decision and upon discovery of new information revealing that MDC was slandering Harper and was engaged in post-termination retaliatory conduct. As a result of plaintiff's diligent actions, Harper asserted a right to a jury trial otherwise unavailable to her.

d.  Undertaking pre-trial discovery, including the interview with and taking of depositions of key witnesses, Sailor and Ritter, respectively;

e.  Reviewing thousands of documents and preparing notes from files relating to Harper's litigation against the City of Hartford, (Harper's employer subsequent to her firing by the MDC) which were relevant to Harper's damages and substantive claims against the MDC. For instance, Harper was fired by the City of Hartford for a pattern of conduct similar to MDC's allegations against Harper. Harper claimed that the MDC was retaliating against her by slanderous accusations that she had engaged in a sexual "orgy" at work while there was evidence that Harper also faced allegations that she had sexually harassed, fondled or touched the breast of another female employee in her subsequent employment at the City of Hartford;

f.  Reviewing Harper's workers' compensation files and preparing notes from medical experts for the purposes of determining the impact of said collateral claims on the amount of damages Harper was entitled to recover;

g.  Preparing and responding to various dispositive motions in Harper's case against the MDC;

4

h. Attending conferences held in conjunction with ongoing labor arbitration hearings(between Harper and MDC) where the parties sought to discuss a global settlement of all claims arising from Harper's termination;

i. Intervening in and mediating ongoing disputes between Harper and Peter Thor, the union representative who was the subject of Harper's constant complaints of ineffective assistance during arbitration, was very often accused of racism by Harper and was even sued in state court by Harper. The said intervention was at Harper's request and was necessary to ensure that Harper, who often refused to cooperate with her union representative, was properly prepared for her testimony before her arbitration;

j. Preparing a comprehensive, detailed Joint Trial Memorandum, including list of exhibits, witness list, voir dire questions, and jury instructions;

k. Preparing for trial and consulting with a second attorney, Kevin Randolph, hired by Harper as co-counsel to assist Plaintiff during trial;

l. Consulting with Harper and preparing detailed summary of case-law supporting advise to Harper that she should not appeal the adverse SBMA decision to the Superior Court;

m. Preparing a detailed summary of the case and relevant documents for use in settlement discussions with para-judicial officer appointed by the federal court;

n. Attending numerous unsuccessful settlement conferences ordered by the Court;

    o.  Preparing Harper's deposition testimony, attending deposition with Harper, responding to MDC's discovery requests;

    p.  Reviewing, analyzing thousands of documents and transcripts from Harper's arbitration proceedings;

    q.  Extensive trial preparations and reproducing Harper's litigation file for attorney Kevin Randolph;

    r.  Consulting with other attorneys and third parties hired by Harper to be involved in her case.

13. On or about Spring 1999, and after the parties had complied with the Court's Trial Preparation order and at a time when the parties were waiting for a jury trial anticipated for Summer 1999, plaintiff was informed by attorney Kevin Randolph that Harper had retained him to represent her in the case against the MDC.

14. Plaintiff, in order to obtain clarification on the status of the attorney-client relationship convened a meeting with Harper and attorney Randolph. During the meeting Harper stated, and Randolph agreed, that Harper had not hired Randolph as a substitute counsel and that she only wanted Randolph as co-counsel to assist plaintiff during the trial.

15. During the meeting, Harper requested that plaintiff have regular conferences and consultations with Randolph for the purpose of enabling Randolph to participate effectively in the forthcoming trial. In addition, Harper requested that Plaintiff make copies of her litigation files and share the same with attorney Randolph in order to enable Randolph to prepare for the trial.

16. Plaintiff complied with Harper's request by meeting with Randolph and having numerous telephone conferences with him, by continuing to make copies of the files for Randolph as requested and attending a settlement conference with Randolph and Harper scheduled for May 26, 1999.

17. Prior to the settlement conference and without prior notice to Plaintiff, Harper had engaged in unprofessional acts in her dealings with Randolph, which forced Randolph to withdraw from representing Harper just three weeks after he first filed his appearance.

18. At the settlement conference all parties were required by the Court to approach the settlement conference with an open mind and to seriously discuss all issues in good faith. Harper refused to speak to Plaintiff before and during the settlement conference.

19. Based on Harper's course of conduct, including during the settlement conference, Attorney Randolph filed a Motion to withdraw his appearance from the case on May 26, 1999. Up to the time of Randolph's withdrawal, Plaintiff had incurred enormous expenses in reproducing the litigation file for Randolph. Plaintiff had, at Harper's request, also spent many hours educating and briefing Attorney Randolph about Harper's case.

20. From June 1999 until September 1999 Harper refused to communicate with Plaintiff except in writing.

21. On or about June 14, 1999 Plaintiff wrote a letter to Harper in which Plaintiff informed Harper that he had done everything to get the case ready for trial except preparation of all witnesses, including Harper, for their trial testimony. Plaintiff also

7

requested that Harper contact him for the purpose of preparing her case. Harper ignored the said letter.

22. On or about July 26, 1999 Plaintiff wrote another letter to Harper informing her that the Court had scheduled yet another settlement conference in her case for **August 10, 1999 at 10:00 a.m.** Plaintiff also enclosed a copy of the Court's instructions regarding the parties' obligations with respect to the settlement conference and reiterated that all parties were required by the Court to approach the settlement conference with an open mind and to seriously discuss all issues in good faith. Plaintiff also restated to Harper that the case was expected to be tried sometime that fall.

23. Plaintiff attended the settlement conference and was informed by Mr. Reed Murphy, the Court-appointed para-judicial officer that Harper would not be appearing and that she would be terminating Plaintiff's services as her attorney.

24. On or about August 1999, plaintiff was contacted by an attorney from Appleton and Appleton, regarding transfer of *"contents of all files any and all information, evidence, materials and documents of any kind (including but not limited to pleadings, transcripts, correspondence, fee agreements, decisions, notes and reports) concerning Ms. Harper."* Plaintiff requested, amongst other things, that the said attorney confirm in writing that he would protect fees and costs incurred in the matter and that he forward to Plaintiff a check in the amount of Plaintiff's out-of-pocket expenses and costs.

25. Attorney Appleton responded by stating that since he had not decided to accept Harper's case for full representation, he requested only that Plaintiff grant him

*unrestricted access to the case file and all documents* in Plaintiff's office including documentation for fees and costs. Plaintiff dutifully complied with Appleton's request.

26. On September 13, 1999, Appleton's associate Peter Evans reviewed Harper's entire file in Plaintiff's office and expressed an interest in returning to Plaintiff's office on September 14, 15, and 16, 1999 to continue review of the file.

27. On September 14, 1999 Appleton's office informed Plaintiff that Evans would not be returning to Plaintiff's office as agreed and that the said attorneys were no longer interested in the Harper case.

28. On September 20, 1999 Plaintiff wrote a letter to Ms. Harper in which he informed Harper as follows: "Please be informed that I have so far incurred the following out of pocket expenses and fees in connection with this case: **$9,378.73** in out of pocket expenses and costs (voluntarily reduced to **$4375.00** in order to facilitate your search for substitute counsel), plus **2,352** hours at an hourly rate of **$150.00** (total $352800.00) based on our contingency fee agreement. Please be informed that I will exercise my right to ***withhold all files, documents, exhibits, etc. I have in your case in order to protect my fees and costs advanced on your behalf***. Before transferring the files to anyone, I would expect any new attorney you retain to (a) confirm in writing that he/she will protect my fees in this matter; (b) forward to me a check in the amount of my out-of-pocket expenses and costs ($4375.00) and that (c) he/she confirm that he/she is willing to pay for the reasonable expenses for preparation and copying of the files for transfer to substitute counsel. It is your responsibility to let

your attorneys know of these conditions. Upon receiving the foregoing from your new attorney, I will promptly assign staff to work on producing the files for transfer."

29. Some time after Plaintiff wrote the September 20, 1999 letter, Harper informed Plaintiff that she wished to have Attorney Neil F "Kim" Murphy review information from her files to decide upon whether he would represent her. Harper requested that Plaintiff provide Attorney Murphy with all assistance necessary.

30. In accordance with Harper's request all attorneys had all Plaintiff's cooperation and enjoyed unrestricted access to the client files involving Ms. Harper.

31. Around November 1999, Attorneys Margaret Fogerty Rattigan and Neil F.(Kim) Murphy, Jr. both of the law firm of Murphy, Laudati & Kiel P.C. made arrangements to review the Harper files in Plaintiff's office. Plaintiff spent time meeting with both attorneys and strongly urged them to accept Harper's case for full representation.

32. With Harper's permission attorneys Rattigan and Murphy obtained copies of the completed Trial Memorandum, jury instructions, exhibit list and some other pleadings in the case from Plaintiff's office to enable them to make informed decisions about the Harper case.

33. Between November 1999 and March 2000, the law firm of Murphy, Laudati & Kiel P.C was seriously reviewing the Harper case to decide whether to represent Harper and was receiving full cooperation from Plaintiff. On February 10, 2000 Plaintiff complied with the request made on the Harper's behalf by providing Attorney Rattigan with complete copies of discovery responses.

34. Plaintiff responded to all queries from attorneys Rattigan and Murphy regarding legal arguments and theories raised in Harper's case. Plaintiff even conducted legal

10

research and wrote memoranda to assist potential counsel in understanding the issues in Harper's case.

35. Around April 2, 2000 Attorney Rattigan telephoned Plaintiff to inform him that she had advised Harper a week earlier that she would not be pursuing the case on her behalf. Attorney Rattigan thanked Plaintiff for the professional courtesy and cooperation she had received from Plaintiff and stated she had kept Harper fully informed of the cooperation she received from Plaintiff.

36. Upon information and belief, Harper contacted attorneys Francis Miniter and Christine Corriveau around March 2000 in connection with a representation in the matter against the MDC.

37. Around May 2000, Corriveau and Miniter sent plaintiff a letter which they undertook to protect plaintiff's fees based on the contingency fee agreement with Harper. The letter did not address the requirements that the substitute attorneys forward to plaintiff a check in the amount of plaintiffs' out-of-pocket expenses.

38. Around May 2000, plaintiff transferred Harper's file to her new counsel, Miniter, after the latter provided plaintiff with a letter of protection.

39. Upon information and belief, Harper, Corriveau and Miniter deliberately sought to pursue frivolous, unfounded charges of ethical violations against plaintiff with the State-wide grievance committee in an effort to deny the plaintiff any payment of fees and expenses in connection with the Harper case.

40. In furtherance of their scheme, Harper, Corriveau and Miniter engaged in the following acts:

11

a. Minter and Harper sent an associate from their law firm to accompany Harper to a grievance committee hearing where they both lied about the transfer of the file from plaintiff.

b. Within three months after plaintiff transferred the file to Harper's counsel and based almost entirely on the work performed by plaintiff, Harper obtained a favorable jury verdict of about $4.6 million dollars. During the course of the jury trial on the common law claims Harper, Miniter and Corriveau recklessly or negligently failed to offer into evidence the contingency fee agreement between plaintiff and Harper or the plaintiff's claim for attorneys fees and costs as stated to both Harper and her attorneys. Harper and her agents knew or should have known that proof of the plaintiff's fees and costs was mandatory and should have been offered in support of the claim for punitive damages. Harper and her agents knew or should have known that punitive damages, which in Connecticut are limited to attorney's fees less taxable costs; may be awarded by a jury whether the defamation is actionable per se or per quod." 50 Am. Jur. 2d, Libel and Slander § 379(1995). Harper and her agents negligently failed to offer plaintiff's testimony; they failed to have Harper testify to the jury regarding the fees and costs owed to plaintiff and they failed to offer the contingency fee agreement and plaintiff's bill. Because of Harper's failure to take any of the foregoing steps, the matter of plaintiff's legal fees was never properly submitted to the jury, and the punitive damages based on plaintiff's fees and costs were never properly

determined by the jury. As a result of Harper's actions or omissions, a punitive damages award of $1.6 million awarded by the jury was reduced by the District Court to a mere $59,000 based on Miniter's claim for fees and costs.

## V. CLAIMS FOR RELIEF
### First Claim For Relief

41. Paragraphs 1-40 are incorporated by reference.

42. Between May 1999 and September 2001, defendant acting individually and in concert with Miniter, Corriveau and others, caused false charges of violation of the Rules of Professional Conduct to issue against the plaintiff, assisted in the prosecution of said charges and continued pursuing the said charges using perjured testimony.

43. Defendant, was motivated in the pursuit of the said charges against the plaintiff not by a belief that the charges had any factual or legal merit or that probable cause for their issuance existed. By her own admission, Harper acted for improper, illegal, and wrongful purpose, to-wit: Harper pursued a frivolous grievance against plaintiff for an alleged refusal to turn over her file even after the said files were given to successor counsel. Harper and her agents conspired to and eventually offered perjured testimony in a hearing before the Statewide Grievance committee by falsely claiming that plaintiff failed to turn over the files until after August 2000. Harper pursued the so-called grievance against plaintiff despite the knowledge that her files had been turned over when a letter of protection was provided to plaintiff.

44. Upon information and belief Harper acted out of spite and malice to vex plaintiff, to cause plaintiff to spend inordinate amount of time in grievance proceedings and

to force plaintiff to give up his claim for fees. .

45. Defendant perjured herself and lied to the Statewide Grievance Committee in an attempt to continue baseless charges against the plaintiff.

46. The Statewide Grievance Committee subsequently dismissed the charges against plaintiff and the proceedings terminated in plaintiff's favor.

47. As a direct result of the defendant's violations, plaintiff suffered economic damages, emotional distress and was injured.

48. Wherefore, Plaintiff requests compensatory and punitive damages in an amount this Court shall consider to be just and fair.

**Second Claim for Relief –**

49. Paragraphs 1 – 48 are incorporated by reference.

50. At all times, Plaintiff was a person of good name, credit and reputation and was held in high esteem by his colleagues, acquaintances, business associates and by the people generally with whom he associated.

51. Commencing on or about October 2000 and continuing through February 2002, defendant frequented an establishment known as "Halls' Restaurant" where she regularly consumed alcohol and regularly discussed plaintiff with several patrons of the bar including one Harris. Defendant maliciously published false reports that plaintiff was incompetent, that plaintiff had stolen and/or refused to release her files or personal property, and that plaintiff had been "found guilty" of incompetence by the Grievance Committee in his representation of Harper or handling of her files.

52. In communications these false and defamatory statements Harper intended to mean that Plaintiff could not be trusted to practice law and the person to whom the

14

defamatory matter was communicated understood the words to have that meaning. The said defamatory statement of Harper as aforesaid did and were calculated to cause great injury to the Plaintiff.

53. WHEREFORE, plaintiffs demand judgment against the defendant for:

   a) compensatory damages in excess of $1.6 million and exemplary damages in excess of $1.6 million, together with costs, interest and attorney fees;

   b) Any further relief to which the plaintiff is entitled.

## JURY DEMAND

The plaintiff **PAUL M. NGOBENI**, hereby demand a trial by jury as to all issues.

PLAINTIFF

*[signature]*
Paul M. Ngobeni
**LAW OFFICES OF PAUL M. NGOBENI**
914 Main Street, Suite 206
East Hartford, CT 06108
Telephone (860) 289-3155
Facsimile (860) 282-7479

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed first-class on December 16, 2003 to:

Attorney Francis Miniter
Miniter & Associates
147 Charter Oak Ave.
Hartford, CT. 06106


Sharon Harper
2901 Waldoah Beach Road
Louisville, KY 40207

_____
Paul M. Ngobeni